UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | |
| | * | Criminal Action No. 1:25-cr-10207-IT |
| ERIC SPOFFORD, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

June 9, 2026

TALWANI, D.J.

Defendant Eric Spofford is charged with Conspiracy to Commit Stalking Through

Interstate Travel and Using a Facility of Interstate Commerce, in violation of 18 U.S.C. § 371

(Count 1); Stalking Using a Facility of Interstate Commerce and Aiding and Abetting, in

violation of 18 U.S.C. § 2261A(2)(B) and 18 U.S.C. § 2 (Count 2); and Stalking Through

Interstate Travel and Aiding and Abetting, in violation of 18 U.S.C. § 2261A(1)(B) and 18

U.S.C. § 2 (Counts 3 and 4). Indict. ¶¶ 16–23 [Doc. No. 1]. Pending before the court are

Spofford's Motion to Dismiss One Object of Count 1 and Entirety of Count 2 [Doc. No. 59] (the

"First Motion to Dismiss") and Motion to Dismiss All Counts on First Amendment Overbreadth

Grounds [Doc. No. 60] (the "Second Motion to Dismiss").

For the reasons set forth below, both the First Motion to Dismiss [Doc. No. 59] and the

Second Motion to Dismiss [Doc. No. 60] are DENIED.

## I.    Background

As alleged in the Indictment [Doc. No. 1], in 2008, Spofford, a resident of Windham,

New Hampshire, and Miami, Florida, founded Granite Recovery Services ("Granite"), a "for-

profit drug and alcohol treatment company[,]" in New Hampshire. Id. ¶ 1. Spofford served as Granite's Chief Executive Officer ("CEO") until he sold the company in December 2021. Id.

In March 2022, New Hampshire Public Radio ("NHPR"), a news organization with broadcasting in New Hampshire and parts of Massachusetts, Maine, and Vermont, published an article on its website "that detailed multiple allegations of sexual misconduct, abusive leadership, and retaliation by Spofford during his time as [CEO] of [Granite]" (the "article"). Id. ¶¶ 5, 10. Spofford publicly denied the allegations and filed a defamation lawsuit against NHPR, which was ultimately dismissed in 2023. Id. ¶ 10.

### A.     *April 2022 Vandalism*

The Indictment [Doc. No. 1] alleges that on or about April 21, 2022, Spofford contacted Eric Labarge, an associate of Spofford living in Hollis, New Hampshire, to provide Labarge with three addresses that Spofford believed to be connected to the NHPR staff members responsible for the article's publication: Victim 1, the NHPR senior reporter who authored the article and resided in Melrose, Massachusetts, after having moved from New Hampshire; Victim 1's parents, Victims 2 and 3, who resided together in Hampstead, New Hampshire; and Victim 4, an NHPR senior editor who worked on the article and resided in Concord, New Hampshire. Id. ¶¶ 2, 6–8, 10, 15(a). Spofford allegedly provided Labarge with "the addresses of Victims 2, 3, and 4, and what Spofford believed was Victim 1's address, but in fact, was the address of Victims 5 and 6[,]" and "instructed Labarge to vandalize the victims' home at night with rocks, bricks, and red spray paint." Id. ¶ 15(a).

On April 22, 2022, Labarge called an acquaintance, Tucker Cockerline, on his cell phone and later met with him in person to "discuss vandalizing the home of Victims 5 and 6 . . . (also Victim 1's former home)" and to provide Cockerline with the associated address, which Labarge

allegedly had received from Spofford. Id. ¶¶ 3, 15(b)–(c). After the meeting, Cockerline searched for the address "us[ing] Google." Id. ¶ 15(d).

Also on April 22, Keenan Saniatan, another acquaintance of Labarge, "used Google" to search for the addresses of Victims 2, 3, and 4. Id. ¶¶ 3, 15(l)–(m). Saniatan "used Google" to search for the addresses of Victims 2 and 3 again on April 23. Id. ¶ 15(n).

On April 24, 2022, Cockerline "used Google to search for and navigate to the address of Victims 5 and 6." Id. ¶ 15(e). That evening, Cockerline threw a brick through a window of Victims 5 and 6's home and spray painted the word "CUNT" on the front of the home. Id. ¶ 15(g). Labarge texted "We good 👍" to Cockerline the next morning, to which Cockerline later replied "All gravy!" via text message . Id. ¶¶ 15(h)–(i).

Also on April 24, Saniatan "traveled to the vicinity of the home of Victims 2 and 3[,]" threw a rock through a window of their home, and spray painted the word "CUNT" on the front of the home. Id. ¶¶ 15(o)-(p). Saniatan then "traveled to the vicinity of Victim 4's home[,]" threw a rock through a window of the home, and spray painted the word "CUNT" on the front door. Id. ¶¶ 15(q)–(r).

On or about April 25, Labarge allegedly met with Cockerline in Nashua, New Hampshire, and "paid [him] for vandalizing the home of Victims 5 and 6." Id. ¶ 15(k). Between on or about April 21, 2022, and April 25, 2022, Spofford allegedly "paid Labarge $10,000 for vandalizing the victims' homes." Id. ¶ 15(s).

B.    *May 2022 Vandalism*

Between May 1 and May 18, 2022, Spofford allegedly provided Labarge with Victim 1's correct address in Melrose, Massachusetts, and, for a second time, Victims 2 and 3's address in

3

New Hampshire. Id. ¶¶ 15(t), (v). He allegedly instructed Labarge "to vandalize the victims' homes at night with bricks and red spray paint." Id. ¶ 15(t).

On May 18, Labarge called Cockerline and met with him in Labarge's home in Hollis, New Hampshire. Id. ¶¶ 15(u)–(v). The two discussed vandalizing the homes of Victims 1, 2, and 3, and Labarge provided Cockerline with the addresses he allegedly received from Spofford. Id. ¶¶ 15(v)–(w).

On May 19, Cockerline texted Michael Waselchuck, a resident of Seabrook, New Hampshire, the following message: "Wanna make sum cash? Lil spray paint [a]nd brick through a window $500. I got 2 spots to hit and would like to split the job." Id. ¶¶ 4, 15(x). The next morning, on May 20, Waselchuck texted Cockerline: "I'm down to do that." Id. ¶ 15(y). Shortly thereafter, Cockerline "used Google to search for the addresses of Victims 1, 2, and 3." Id. ¶ 15(z).

That afternoon, Cockerline drove from New Hampshire to Methuen, Massachusetts, where he purchased two bricks. Id. ¶¶ 15(aa)–(bb). Around 6:00 p.m., Cockerline met with Waselchuck in Salem, New Hampshire, to "discuss vandalizing the homes of Victims 1, 2, and 3." Id. ¶ 15(cc). Cockerline also provided a can of red spray paint and one of the two bricks to Waselchuck. Id. ¶ 15(dd).

After again "us[ing] Google" to search for the address of Victims 2 and 3's home and navigate there, Cockerline "traveled to the vicinity of the home of Victims 2 and 3[,]" threw a brick at the home's exterior, and spray painted the word "CUNT" on the front of the home. Id. ¶¶ 15(ee)–(hh). Waselchuck "traveled . . . to the vicinity of Victim 1's home in Melrose, Massachusetts." Id. ¶ 15(ii).

On May 21, 2022, around 5:50 a.m., Waselchuck threw a brick through a window of Victim 1's home and spray painted the phrase "JUST THE BEGINNING" on the front of the home. Id. ¶ 15(jj). Around 10:13 a.m., Labarge texted Cockerline: "Morning player. Smooth?" Id. ¶ 15(kk). Cockerline responded: "Relatively." Id. ¶ 15(ll).

Between on or about May 18, 2022, and May 22, 2022, Spofford allegedly "paid Labarge $10,000 in cash for vandalizing the homes of Victims 1, 2, and 3." Id. ¶ 15(mm). On May 22, Labarge had two brief phone calls with Cockerline and met with him at Labarge's home in Hollis, New Hampshire, to "pa[y] Cockerline for vandalizing the homes of Victims 1, 2, and 3." Id. ¶¶ 15(nn)–(oo). Approximately one hour later, Cockerline texted Waselchuck the following message: "Come thru when you want your paycheck." Id. ¶ 15(pp).

## II.    Discussion

Under Federal Rule of Criminal Procedure 12(b)(1), a defendant may raise by pretrial motion "any defense . . . that the court can determine without a trial on the merits." The defense that there is a defect in the indictment, including that "the indictment 'fail[s] to state an offense[,]' must be raised by pretrial motion when 'the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits.'" United States v. Rodriguez-Rivera, 918 F.3d 32, 34 (1st Cir. 2019) (quoting Fed. R. Crim. P. 12(b)(3)(B)(v)).

In the First Motion to Dismiss [Doc. No. 59], Spofford seeks dismissal of "so much of Count 1 that charges conspiracy to violate [18 U.S.C.] § 2261A(2)(B)" and Count 2, on the grounds that "the specific facts alleged . . . fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." Id. at 1, 7 (quoting United States v. Willis, 844 F.3d 155, 162 (3d Cir. 2016); and citing United States v. Enmons, 410 U.S. 396, 412 (1973)). In the Second Motion to Dismiss [Doc. No. 60], Spofford seeks dismissal of all counts in the Indictment [Doc. No. 1], arguing that the statute on which the four counts are premised, 18

U.S.C. § 2261A, is "unconstitutionally overbroad" and therefore violates the First Amendment to the United States Constitution. Id. at 1. The court first addresses the Second Motion to Dismiss [Doc. No. 60] and then turns to the First Motion to Dismiss [Doc. No. 59].

A. *Spofford's Second Motion to Dismiss*

Spofford raises a facial challenge to 18 U.S.C. § 2261A under the First Amendment's "overbreadth doctrine." See Second Mot. to Dismiss 1, 3–5 [Doc. No. 60].

1. The Overbreadth Doctrine

To determine if a statute is overbroad, courts engage in a two-step analysis. First, the court must "construe the challenged statute[,]" as "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." United States v. Williams, 553 U.S. 285, 293 (2008). Second, the court must determine whether the statute as construed "criminalizes a substantial amount of protected expressive activity." Id. at 297. When a facial attack on a statute is based on the First Amendment, "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." Ams. for Prosperity Found. v. Bonta, 594 U.S. 595, 615 (2021) (quotation omitted). Therefore,

> even when a law may be applied to a particular individual in a constitutionally unobjectionable way, if that individual can show that the law is facially overbroad—that is, that it "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep,"—the proper remedy is to "invalidate all enforcement of that law."

United States v. Ackell, 907 F.3d 67, 72 (1st Cir. 2018) (quoting Virginia v. Hicks, 539 U.S. 113, 118-19 (2003) (internal quotations omitted)). "Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment[,]" however, the Supreme Court "recognize[s] that the overbreadth

6

doctrine is strong medicine and ha[s] employed it with hesitation, and then only as a last resort."

New York v. Ferber, 458 U.S. 747, 769 (1982) (quotation omitted); see Los Angeles Police

Dep't. v. United Reporting Publ'g Corp., 528 U.S. 32, 39 (1999) (instructing that "invalidation

for overbreadth" should not be "casually employed").

    2.  Statutory Background

The statute criminalizing "[i]nterstate stalking" under which Spofford is charged,

18 U.S.C. § 2261A, was first enacted in 1996. Pub. L. No. 104-201, Div. A, Title X, § 1069(a),

Sept. 23, 1996, 110 Stat. 2655. Congress has amended § 2261A several times since its

enactment, including, as relevant here, as part of the Violence Against Women Reauthorization

Act of 2013. Pub. L. No. 113-4, Title I, § 107(b), Mar. 7, 2013, 127 Stat. 77. Section 2261A, as

amended, provides in relevant part:

> Whoever—
>
>> (1) travels in interstate . . . commerce . . . with the intent to kill, injure, harass, or place under surveillance with intent to kill, injure, harass, or intimidate another person, and in the course of, or as a result of, such travel or presence engages in conduct that—
>>
>>> (A) places that person in reasonable fear of the death of, or serious bodily injury to—
>>>
>>>> (i) that person;
>>>>
>>>> (ii) an immediate family member . . . of that person; or
>>>>
>>>> (iii) a spouse or intimate partner of that person; or
>>>
>>> (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of subparagraph (A); or
>>
>> (2) with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that—
>>
>>> (A) places that person in reasonable fear of the death of or serious bodily injury to a person described in clause (i), (ii), or (iii) of paragraph (1)(A); or

(B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of paragraph (1)(A)

shall be punished[.]

18 U.S.C. § 2261A (emphases added to reflect the language from the 2013 amendment at issue in Spofford's Second Motion to Dismiss [Doc. No. 60]).

Spofford contends that, due to the statute's use of the phrase "would be reasonably expected to cause substantial emotional distress," the post-amendment version no longer "require[s] a showing of 'actual[]' harm to the victim." Second Mot. to Dismiss 5–6 [Doc. No. 60] (quoting United States v. Sayer, 748 F.3d 425, 433 (1st Cir. 2014)). In support of this argument, Spofford links the change in the statutory language from "causes substantial harm" to "causes, attempts to cause, or would reasonably be expected to cause substantial emotional distress" to the type of impermissible objective standard of harm identified by the Supreme Court in Counterman v. Colorado, 600 U.S. 66 (2023), as described below. See Second Mot. to Dismiss at 6–16 [Doc. No. 60].

3.  The Law in the First Circuit

In Ackell, the First Circuit addressed a pre-Counterman First Amendment overbreadth challenge to 18 U.S.C. § 2261A(2)(B), as amended in 2013. See 907 F.3d at 71–77. As construed by the First Circuit, the elements of a violation of § 2261A(2)(B) are:

(1) the defendant had the requisite intent; (2) the defendant engaged in a course of conduct; (3) the defendant used a facility of interstate commerce; and (4) the defendant's course of conduct caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress.

Id. at 72. For the purposes of the statute, a "course of conduct" is "a pattern of conduct composed of [two] or more acts, evidencing a continuity of purpose." Id. (quoting 18 U.S.C. § 2266(2)).

Like Spofford, the appellant in Ackell argued that § 2261A(2)(B) targets speech, rather than conduct, and impermissibly reaches speech, through its "intent element and harm element[,]" that is "neither a true threat nor integral to criminal conduct." Id. at 75.

As to the first argument, the First Circuit held that the statute "regulates not speech, but conduct—or, to be precise[,] courses of conduct." Id. (quotation omitted). Although conduct may be protected under the First Amendment "if it is 'sufficiently imbued with elements of communication[,]'" id. at 73 (quoting Texas v. Johnson, 491 U.S. 397, 404 (1989)), no such protection arose in Ackell where "the overbreadth doctrine's concern with chilling protected speech attenuates as the otherwise unprotected behavior that it forbids [legislatures] to sanction moves from pure speech toward conduct." Id. at 74 (quoting Hicks, 539 U.S. at 124 (alteration in original)). From the "plain . . . text" of the statute, the First Circuit concluded that, although the statute "could reach highly expressive conduct[,]" it "covers countless amounts of unprotected conduct." Id. at 73; see id. at 74 (finding further support for the constitutionality of § 2261A(2)(B) where the statute does not "implicate" First Amendment protections in public fora).

The First Circuit similarly rejected the appellant's second argument, including his position that "the reasonable-person standard embedded in the statute's harm-caused element criminalizes protected speech by allowing for a conviction when no harm has actually occurred." Id. at 75. As Spofford points out, see Second Mot. to Dismiss 12 [Doc. No. 60], the Ackell court "acknowledge[d] that § 2261A(2)(B) could have an unconstitutional application[.]" 907 F.3d at 77. Nevertheless, the First Circuit found no basis on which to hold the statute "facially overbroad" where the statute "does not, on its face, regulate protected speech, or conduct that is necessarily intertwined with speech or expression" and where "as-applied challenges [to

9

§ 2261A(2)(B)] will properly safeguard the rights that the First Amendment enshrines" should the statute be applied "to courses of conduct that are sufficiently expressive to implicate the First Amendment." Id.

Spofford acknowledges Ackell but argues that the First Circuit's "characterization" of 18 U.S.C. § 2261A(2)(B) as "'target[ing] conduct . . . rather than speech protected by the First Amendment'" is erroneous. Second Mot. to Dismiss 5, 10  n.5 [Doc. No. 60] (quoting Ackell, 907 F.3d at 74). But Spofford does not meaningfully engage with the First Circuit's key interpretive holding in Ackell: that the "text of the [statute] is clear in that it targets conduct . . .rather than speech protected by the First Amendment." 907 F.3d at 74. Section 2261A is thus "a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech[,] such as picketing or demonstrating[.]" Id. at 72 (quoting Hicks, 539 U.S. at 124). Spofford consequently faces a high hurdle where "rarely, if ever, will an overbreadth challenge succeed" against such laws. Id.

"Until a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority." Eulitt ex rel. Eulitt v. Maine Dep't of Educ., 386 F.3d 344, 349 (1st Cir. 2004), abrogated on other grounds by Carson ex rel. O.C. v. Makin, 596 U.S. 767 (2022); see United States v. Moore-Bush, 963 F.3d 29, 37 (1st Cir. 2020) ("Courts are absolutely bound to follow vertical precedents."). The binding nature of Ackell upon this court is thus dispositive as to Spofford's Second Motion to Dismiss [Doc. No. 60] unless Spofford has demonstrated that the Supreme Court's decision in Counterman "unmistakably" invalidated Ackell. As set forth below, the court finds that Spofford has failed to do so.

10

4.   The *Counterman* Decision

Spofford asserts that "[w]hatever the reach or breadth of the [First Circuit's] decision in Ackell[,]" the case "on this issue[] is not binding" on the court where Ackell was decided without "the benefit of Counterman." Second Mot. to Dismiss 13 [Doc. No. 60].

The Colorado statute at issue in Counterman criminalized "'repeatedly . . . mak[ing] any form of communication with another person' in 'a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person . . . to suffer serious emotional distress.'" 600 U.S. at 70 (quoting Colo. Rev. Stat. § 18-3-602(1)(c) (2022)). The defendant was convicted under this statute, and, after he was afforded no relief on appeal in state court, the Court granted certiorari as to the underlying state criminal case to address a divide among courts "about (1) whether the First Amendment requires proof of a defendant's subjective mindset in true-threats cases, and (2) if so, what *mens rea* standard is sufficient." Id. at 72.

Stated differently, the Court was concerned with "whether the First Amendment . . . demands that the State in a true-threats case prove that the defendant was aware in some way of the threatening nature of his communications." Id.; see Virginia v. Black, 538 U.S. 343, 359 (2003) (defining "true threats" as "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals"). "True threats of violence, everyone agrees, lie outside the bounds of the First Amendment's protection." Counterman, 600 U.S. at 72. But in light of the "hazard of self-censorship" that necessarily arises when even unprotected speech is criminalized, the Court held that the Colorado statute violated the First Amendment because it lacked the "important tool" of "condition[ing] liability on the State's showing of a culpable mental state." Id. at 75, 78; see id. at 75 ("'By reducing an honest speaker's fear that he may accidentally or erroneously incur

11

liability,' a *mens rea* requirement 'provides "breathing room"' for more valuable speech." (quoting United States v. Alvarez, 567 U.S. 709, 733 (2012) (Breyer, J., concurring)) (cleaned up)). As to the culpable mental state required, the Court held that recklessness is the appropriate *mens rea*, as recklessness "offers enough breathing space for protected speech, without sacrificing too many of the benefits of enforcing laws against true threats." Id. at 82 (quotation omitted).

Spofford asserts that, under the reasoning of Counterman, 18 U.S.C. § 2261A is rendered unconstitutional by "[t]he objective standard injected into [the statute] in 2013 . . . [that] has now been eschewed by the Supreme Court." Second Mot. to Dismiss 8 [Doc. No. 60]. The government argues, inter alia, that Counterman is inapposite to this case where, as the First Circuit has previously held, "[S]ection 2261A targets conduct, not speech." Opp'n 3 [Doc. No. 65] (citing Ackell, 907 F.3d at 73).

As a threshold issue, Counterman, which addressed a state statute directed at speech, does not change § 2261A's scope. Compare Colo. Rev. Stat. § 18-3-602(1)(c) (2022) (criminalizing "repeatedly . . . mak[ing] any form of communication with another person . . . in a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person . . . to suffer serious emotional distress" (emphasis added)), with 18 U.S.C § 2261A(1) (applying when an individual "travels in interstate or foreign commerce . . . and in the course of, or as a result of, such travel or presence engages in conduct. . . ." (emphasis added)), and id. § 2261A(2) (applying when an individual "uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct. . . ." (emphasis added)).

As the First Circuit in <u>Ackell</u> acknowledged, the Supreme Court "has not categorically foreclosed the possibility that a statute that does not facially regulate speech could be facially overbroad under the First Amendment[.]" 907 F.3d at 74 (citing <u>Hicks</u>, 539 U.S. at 124). Spofford seizes on this idea, particularly with respect to his argument that, under <u>Counterman</u>, § 2261A "is the kind of statute that will 'discourage the uninhibited, robust, and wide-open debate that the First Amendment is intended to protect'" by virtue of its "objective standard of harm[.]" Second Mot. to Dismiss 6, 9 [Doc. No. 60] (quoting <u>Counterman</u>, 600 U.S. at 78).

Spofford offers several hypothetical examples of protected speech that the statute could criminalize either in the absence of a subjective standard or if the statute contains an "intent to harass or intimidate *mens rea* requirement (criminal or otherwise)" based on <u>Ackell</u>, as Spofford alternatively contends. Second Mot. to Dismiss 9–11 [Doc. No. 60]. For example, Spofford points to the purported threat that § 2261A poses to "social media posts by prominent elected officials [that] could readily be construed as intended to harass or intimidate" or "'negative restaurant reviews left on Google or Yelp, irate emails sent to service providers (contractors, plumbers, etc.), . . . or antagonistic comments left on news sites [that] are often persistently annoying or even scary.'" <u>Id.</u> at 9, 11 (quoting <u>United States v. Yung</u>, 37 F.4th 70, 78 (3d Cir. 2022)). The government asserts that Spofford's "parade of examples . . . are not violations of the stalking statute just because [he] says so." Opp'n 8 [Doc. No. 65]. Insofar as the government must offer "proof of serious criminal intent" to obtain a conviction under § 2261A, the government takes the position that Spofford's "vague examples of social media harassment scarcely meet this threshold." <u>Id.</u>

As noted <u>supra</u>, to succeed on a facial overbreadth challenge, Spofford must demonstrate that § 2261A "criminalizes a <u>substantial</u> amount of protected expressive activity." <u>Williams</u>, 553

U.S. at 293 (emphasis added). The court first observes that Spofford's examples of protected

speech to which § 2261A may apply are of the same tenor as those raised, and ultimately deemed

insufficient, in Ackell. See 907 F.3d at 76–77 ("[I]n the absence of veridical examples, we are

not inclined to rely on hypotheticals[,]" including appellant's hypothetical involving "an

individual who, with merely the intention to harass, twice directs speech on a matter of public

concern at someone[,] say, via Twitter").

That § 2261A could reach such speech is also not a basis on which the court can conclude

that such applications of the statute are "substantial" in light of its "plainly legitimate sweep[,]"

Hicks, 539 U.S. at 118–19 (quotation omitted): "[W]hile [the statute] could reach highly

expressive conduct, it is plain from the statute's text that it covers countless amounts of

unprotected conduct[.]" Ackell, 907 F.3d at 73 (emphasis added); see Thayer v. City of

Worcester, 755 F.3d 60, 72 (1st Cir. 2014) ("After all, there is no good reason to allow facial

challenges when the likelihood of unjustifiable applications is limited to a trivial number or

dwarfed by constitutional impositions."), judgment vacated on other grounds sub nom. Thayer v.

City of Worcester, Mass., 576 U.S. 1048 (2015) (mem.). Spofford does not cogently demonstrate

that Counterman changes this calculus. See Ackell, 907 F.3d at 73; see also United States v.

Jubert, 139 F.4th 484, 493–94 (5th Cir. 2025) (rejecting a facial overbreadth challenge to

§ 2261A(2)(B)); United States v. Crawford, No. 23-2532, 2025 WL 1248825, at *1 (9th Cir.

Apr. 30, 2025) (holding that "Counterman is not clearly irreconcilable" with the Ninth Circuit's

pre-Counterman rejection of both a facial and as-applied overbreadth challenge to 18 U.S.C.

§ 2261A).

As the foregoing discussion illustrates, Spofford has failed to demonstrate that

Counterman necessarily invalidates the First Circuit's interpretation of 18 U.S.C. § 2261A as

14

"target[ing] conduct, specifically conduct performed with serious criminal intent, rather than speech protected by the First Amendment." Ackell, 907 F.3d at 74 (quotation omitted). Accordingly, Spofford offers no legitimate basis on which the court may depart from First Circuit precedent on this issue. See Moore-Bush, 963 F.3d at 29; Eulitt ex rel Eulitt, 386 F.3d at 349; accord Crowe v. Bolduc, 365 F.3d 86, 94 (1st Cir. 2004) (holding that, although dictum in a Supreme Court case "presaged [its] demise[,]" a First Circuit case "remained good law in this circuit" and a valid basis on which a district court rendered a decision where the First Circuit had not yet abrogated the case).

The Second Motion to Dismiss [Doc. No. 60] is therefore DENIED.

B.      *Spofford's First Motion to Dismiss*

In his First Motion to Dismiss [Doc. No. 59], Spofford moves to dismiss Count 1 of the Indictment [Doc. No. 1], insofar as it is based on an alleged conspiracy to violate 18 U.S.C. § 2261A(2)(B), and Count 2, in which Spofford is charged with violating the same. First Mot. to Dismiss 1 [Doc. No. 59]. Section 2261A(2)(B) criminalizes conduct in which

> with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that . . . causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of paragraph (1)(A).

18 U.S.C. § 2261A(2)(B) (emphasis added).

Spofford submits that "§ 2261A(2)(B), properly construed, criminalizes the 'use' of 'facilities of interstate commerce' only when that 'use' is 'at the crux of what makes the underlying offense criminal[.]'" First Mot. to Dismiss 1 [Doc. No. 59] (quoting Dubin v. United States, 599 U.S. 110, 114 (2023)). In response, the government argues, inter alia, that Spofford's reading of § 2261A(2)(B) is contrary to the statutory text and that the Supreme Court's 2023

decision in Dubin, on which Spofford relies, "is inapposite, as it involves the Supreme Court's analysis of a different criminal statute with distinct statutory language and dissimilar statutory context." Opp'n 1–2 [Doc. No. 64].

When interpreting a statute, courts "strive 'to effectuate congressional intent.'" United States v. Freeman, 147 F.4th 1, 13 (1st Cir. 2025) (quoting City of Providence v. Barr, 954 F.3d 23, 31 (1st Cir. 2020)). To do so, the court begins with the statutory text and "interprets a statute's words based on their plain and ordinary meaning at the time of the statute's enactment." United States v. Abreu, 106 F.4th 1, 12 (1st Cir. 2024) (citing Bostock v. Clayton Cnty., 590 U.S. 644, 654 (2020)); City of Providence, 954 F.3d at 31 ("When Congress uses a term in a statute and does not define it, we generally assume that the term carries its plain and ordinary meaning."). "[T]here is no reason to look past the statutory text itself if that text is unambiguous and consistent with a coherent statutory scheme." Freeman, 147 F.4th at 13 (first citing Penobscot Nation v. Frey, 3 F.4th 484, 490 (1st Cir. 2021); and then citing City of Providence, 954 F.3d at 31–32).

The court finds that the plain text of § 2261A(2)(B) is unambiguous and does not support Spofford's interpretation of the statute. Section 2261A(2)(B) is violated when an individual "with the intent to kill, injure, harass, [or] intimidate . . . uses . . . any . . . facility of interstate or foreign commerce to engage in a course of conduct" that "causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress" to persons enumerated in the statute. 18 U.S.C. § 2261A(2)(B). Under Spofford's interpretation, the "facility of interstate or foreign commerce"—in this case, Spofford's associates' alleged use of the internet to locate and navigate to victims' homes and use of cell phones to communicate with one another—must be, inter alia, "at the locus of [the criminal] undertaking[,]" First Mot. to Dismiss 11 [Doc. No. 59] (quoting

16

Dubin, 599 U.S. at 123); a "'key mover in the criminality[,]'" id. at 12 (quoting Dubin, 599 U.S. at 123); or an "'an operative factor' in the offense conduct[,]" Reply 3 [Doc. No. 68] (quoting Bailey v. United States, 516 U.S. 137, 143 (1995)).

But this interpretation of § 2261A(2)(B) "runs afoul of the cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute." Loughrin v. United States, 573 U.S. 351, 358 (2014) (quotation omitted). As reflected in the plain language of the text, § 2261A(2)(B) does not criminalize the "use" of a "facility of interstate or foreign commerce" that "causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress[.]" Instead, the statute criminalizes the "use" of a "facility of interstate or foreign commerce to engage in a course of conduct" that "causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress[.]" 18 U.S.C. § 2261A(2)(B) (emphasis added). The "use" of the "facility of interstate or foreign commerce" does not itself need to cause substantial emotional distress—it need only be part of a broader "course of conduct" that causes or attempts to cause such an effect. See id. The interpretation Spofford urges thus effectively, and improperly, excises "engage in a course of conduct" from the statute. See Brown v. United Airlines, 720 F.3d 60, 68 (1st Cir. 2013) ("[I]t is settled law that courts should strive to breathe life into every word and phrase in a statute."); see also United States v. Elkins, 725 F. Supp. 3d 570, 574 (N.D. Tex. 2024) (rejecting an interpretation of the statute similar to Spofford's where "[n]either the text of § 2261A(2) nor other courts in [the Fifth Circuit] require the facilities of interstate commerce to be used in a direct, communicative manner against the victim").

The Supreme Court's decision in Dubin does not counsel a different result. In Dubin, the Court interpreted 18 U.S.C. § 1028A(a)(1), which requires a mandatory minimum sentence of

17

two years of imprisonment for aggravated identity theft "in addition to the punishment" for the predicate offenses enumerated in § 1028A(c). 599 U.S. at 115. Section 1028A(a)(1) provides:

> Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

The Court held that "use[,]" as that term is employed in § 1028A(a)(1), must be interpreted to "capture[] the ordinary understanding of identity theft, where misuse of a means of identification is at the crux of the criminality." Dubin, 599 U.S. at 120.

Although Spofford relies on this language in arguing that "use" must be similarly interpreted for the purposes of 18 U.S.C. § 2261A(2)(B), he also acknowledges that the Court in Dubin held that "'"use" takes on different meanings depending on context,' requiring examination of 'the statute and the [surrounding] scheme to determine the meaning Congress intended.'" First Mot. to Dismiss 9 [Doc. No. 59] (quoting Dubin, 599 U.S. at 118). Here, as noted above, an examination of the statute reveals no indication that Congress intended that the "use" of a "facility of interstate or foreign commerce" be the direct cause of "substantial emotional distress[,]" rather than one component of a "course of conduct" having such an effect. Where Dubin instructs that "use" should be interpreted contextually, see 599 U.S. at 118, it does not require or suggest that the meaning of "use" in 18 U.S.C § 1028A(a)(1) should be ported to other statutes in which the verb "use" appears, including as to 18 U.S.C. § 2261A(2)(B). See, e.g., United States v. Hutton, 159 F.4th 636, 643 (9th Cir. 2025) (rejecting a similar post-Dubin argument as to the meaning of "use" in 18 U.S.C. § 2251(a)), petition for cert. filed, No. 25-971 (Feb. 13, 2026); United States v. Rivers, 108 F.4th 973, 980 (7th Cir. 2024) (holding that Dubin left the interpretation of 18 U.S.C. § 924(c) "undisturbed because the relevant terms, including 'use' and 'in relation to[,]' are context dependent"); see also United States v. Diaz, No. 23-1341,

18

2025 WL 275117, at *2 (9th Cir. Jan. 23, 2025) (in an unpublished decision, rejecting the same argument raised by Spofford as to the impact of Dubin on 18 U.S.C. § 2261A where "[t]he particular circumstances of the aggravated identity theft statute are not remotely present").

In sum, Spofford offers no support for his contention that 18 U.S.C. § 2261A(2)(B) requires that the facility of interstate commerce be used directly to harass or intimidate victims. Accordingly, the First Motion to Dismiss [Doc. No. 59] is DENIED.

### III.    Conclusion

For the foregoing reasons, Spofford's First Motion to Dismiss [Doc. No. 59] and Second Motion to Dismiss [Doc. No. 60] are DENIED.

IT IS SO ORDERED.

June 9, 2026                          /s/ Indira Talwani
                                     United States District Judge